IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 20-cr-30132-SMY |
| JAMI L. MAYHEW, | ) |
| | ) 18 U.S.C. § 1347 |
| Defendant. | ) |
| | ) |

## INFORMATION

**THE UNITED STATES ATTORNEY CHARGES:**

At all times relevant to this Information:

1.  The defendant, JAMI L. MAYHEW, was a nurse practitioner, employed by General Medicine, P.C., licensed in Illinois, residing and working at various locations within the Southern District of Illinois, and enrolled as a provider in the federal Medicare program.

2.  General Medicine, P.C., was a private company headquartered in Novi, Michigan that, among other things, contracted with doctors and nurses to provide medical services to nursing home residents in several parts of the United States, including southern Illinois.

The Medicare Program

3.  Medicare was a health care benefit program, as defined in 18 U.S.C. § 24(b), that provided federal health insurance benefits to people over the age of 65 and younger people who suffer from certain disabilities. Medicare was administered by the U.S. Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services. Individuals receiving benefits under Medicare were referred to as Medicare beneficiaries.

4.  Medicare was divided into several parts. Medicare Part B authorized payment for covered services rendered by enrolled providers to Medicare beneficiaries, including evaluation and management (E&M) services provided to Medicare beneficiaries in nursing homes.

5.  Providers seeking reimbursement from Medicare were required to certify that the reported services were actually provided and medically necessary. Under Medicare rules, health care services were medically necessary if they met accepted standards of medicine and were needed to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms. Not all services that might be beneficial to a person's health were considered medically necessary.

6.  Medicare used the Current Procedural Terminology (CPT) codes for all billing claims and reimbursements. CPT was a medical procedures code set produced and maintained by the American Medical Association, updated annually, and included in Level I of the Healthcare Common Procedure Coding System. Each CPT code was assigned to a specific task or service. The purpose of the CPT was to enable accurate, consistent, and uniform reporting of medical, surgical, and diagnostic services to entities such as health insurance companies and health care benefit programs.

Physician Visits in Nursing Homes

7.  Nursing homes (or nursing facilities) were a type of long-term residential housing that provided around-the-clock medical and personal services for residents, typically older adults or disabled persons, who were not otherwise capable of living independently or caring for themselves.

8.  Federal regulations mandated that all nursing home residents were to be seen by a physician at least once every 30 days for the first 90 days after admission, and at least once every 60 days thereafter.

9.  During each federally mandated physician visit with a nursing home resident, federal regulations required the physician to (a) review the resident's total program of care, including medications and treatments; (b) write, sign, and date a progress note; and (c) sign and date all orders (except for certain vaccines).

10.     For all physician visits and other required physician tasks in a nursing home, including the initial nursing home visit, federal regulations and Illinois state law provided that they could be satisfied when performed by a nurse practitioner, a clinical nurse specialist, or a physician assistant, so long as that person was working in collaboration with a physician and was not an employee of the facility.

11.     Medicare did not cover the costs of ordinary nursing home care but reimbursed enrolled providers for federally-mandated nursing home visits and other medically necessary visits in a nursing home. The amount of the reimbursement varied depending on the CPT code billed.

12.     Providers seeking reimbursement from Medicare for a subsequent nursing home visit (a visit that occurred after the patient's initial visit with a physician) were required to report one of four possible CPT codes: 99307, 99308, 99309, or 99310. Those codes, associated descriptions, and 2017 national Medicare reimbursement rates were as shown in the table below.

| CPT Code | Description | Medicare Reimbursement Rate (2017) |
|---|---|---|
| 99307 | Subsequent nursing home visit – 10 minutes | $45.22 |
| 99308 | Subsequent nursing home visit – 15 minutes | $69.98 |
| 99309 | Subsequent nursing home visit – 25 minutes | $92.59 |
| 99310 | Subsequent nursing home visit – 35 minutes | $137.81 |

13.     Use of these codes depended on a number of factors, including the reason for the visit, the seriousness of the patient's problem, the number of body systems that needed to be reviewed, the relative complexity of the required medical decision-making, and the time necessary to complete the visit. In general, the more complex the visit, the higher the level of code that could be billed.

14.     CPT 99310 had the highest reimbursement rate of any subsequent nursing home visit. It described a subsequent nursing home visit for the evaluation and management of a patient where at least two of the following three key components were required: (a) a comprehensive interval history, including an extended history of present illness, a complete past, family, and social history, and a complete review of at least ten body systems directly related to the identified

problems; (b) a comprehensive physical examination; and (c) medical decision making of high complexity. These tasks, as well as time spent coordinating the patient's care with other medical service providers, were estimated to take approximately 35 minutes to complete.

15. Time spent filling out patient charts or completing other record-keeping tasks associated with a nursing home visit was not included in the CPT time estimates and could not be used by the provider to justify billing Medicare at a higher rate.

16. Medicare allowed only the medically necessary portion of a face-to-face visit. Therefore, when deciding which CPT code to bill, providers were required to consider only the medically necessary services they provided for the condition of the patient at the time of the visit.

## COUNT 1
### Health Care Fraud – 18 U.S.C. § 1347

17. Paragraphs 1 through 16 of this information are incorporated herein.

18. From on or about May 30, 2017, and continuing until on or about June 26, 2017, in the Illinois counties of St. Clair and Madison, within the Southern District of Illinois and elsewhere, the defendant,

JAMI L. MAYHEW,

in connection with the delivery of health care benefits, items, and services, knowingly and willfully participated in, executed, and attempted to execute a scheme to defraud Medicare, a health care benefit program as defined in Title 18, United States Code, Section 24(b), and to obtain money by means of materially false and fraudulent representations, in violation of Title 18, United States Code, Section 1347.

19. The fraudulent scheme was devised by MAYHEW's employer, General Medicine, P.C., and involved falsely billing Medicare for medically unnecessary E&M services provided to Medicare beneficiaries in nursing homes. Specifically, General Medicine, P.C., instructed its clinicians to perform certain so-called "regulatory" visits with nursing home residents each month, under the false pretense that these monthly visits – called a Care Plan Review (CPR) and a Monthly Medication Reconciliation (MMR) – were mandated by Medicare regulations.

20. At the direction of General Medicine, P.C., MAYHEW carried out the fraudulent scheme by repeatedly seeing nursing home residents multiple times each month, examining them for only a few minutes at a time, generating progress notes she knew contained misrepresentations and materially false statements about the E&M services she supposedly provided the residents in her care, and falsely reporting that those services – called CPRs and MMRs – met the requirements for billing CPT 99310, when in fact they had not.

21. From May 30 to June 26, 2017, MAYHEW visited residents of nursing homes in southern Illinois on 15 separate days, spending an average of 145 minutes inside the homes each day. During that time, in furtherance of the fraudulent scheme, MAYHEW knowingly caused 251 false claims to be submitted to Medicare using CPT 99310, totaling $50,200.

22. These claims were materially false because they falsely indicated that the services MAYHEW provided were medically necessary and included at least two of the following components: a comprehensive interval history; a comprehensive physical examination; and medical decision making of high complexity. In fact, as she well knew, the MMRs and CPRs that MAYHEW performed at the direction of General Medicine, P.C., did not meet those requirements.

23. MAYHEW knew that General Medicine, P.C., would use the false information she provided to support a claim for reimbursement to Medicare under CPT 99310.

24. As a result of MAYHEW's fraudulent conduct, Medicare paid General Medicine, P.C., over $23,000. MAYHEW also benefited financially from the fraudulent scheme, because General Medicine, P.C., paid her $27 per billable patient encounter. For the 251 false claims she caused to be submitted, General Medicine, P.C., paid MAYHEW over $6,000.

All in violation of Title 18, United States Code, Section 1347.

*[signature]*

STEVEN D. WEINHOEFT
United States Attorney

*[signature]*

NATHAN D. STUMP
Assistant United States Attorney